UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| TIBURON OPPORTUNITY FUND LP, SYDNE AND ALLAN BORTEL LIVING TRUST, CROSS RIVER PARTNERS LP, ANGLIAN HOLDINGS LLC, COLUMBUS CAPITAL PARTNERS, L.P., COLUMBUS CAPITAL QP PARTNERS, L.P., ROVIDA WEST COAST INVESTMENTS LTD., FLMM, LTD., LONDON FAMILY TRUST, JON D. AND LINDA W. GRUBER TRUST, ANKAP PARTNERS, LP, ROBERT S. ANDERSON, ANDERSON FAMILY FOUNDATION, LUCY LYDEN ANDERSON, ROBERT J. ANDERSON TRUST, WARD STEPHEN ANDERSON TRUST, JOHN L. ANDERSON TRUST, LYDEN FAMILY TRUST and JOHN P. LYDEN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civ. No.<br><br>COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND FOR FRAUD AND FRAUDULENT CONCEALMENT |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| DIGILITI MONEY GROUP, INC., f/k/a CACHET FINANCIAL SOLUTIONS, INC., JEFFREY C. MACK, BRYAN D. MEIER, JAMES L. DAVIS, MICHAEL J. HANSON, ROD JARDINE, DARIN P. McAREAVEY, RUTH OWADES, LIYUAN WOO, JAMES J. SPENCER, ROBIN S. O'CONNELL, LAKE STREET CAPITAL MARKETS, LLC and NATIONAL SECURITIES CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | DEMAND FOR JURY TRIAL |

Plaintiffs Tiburon Opportunity Fund LP, the Sydne and Allan Bortel Living Trust, Cross River Partners LP, Anglian Holdings LLC, Columbus Capital Partners, L.P., Columbus Capital QP Partners, L.P., Rovida West Coast Investments Ltd., FLMM, Ltd., the London Family Trust, the Jon D. and Linda W. Gruber Trust, AnKap Partners, LP, Robert S. Anderson, the Anderson Family Foundation, Lucy Lyden Anderson, the Robert J. Anderson Trust, the Ward Stephen Anderson Trust, John L. Anderson Trust, the Lyden Family Trust and John P. Lyden ("Plaintiffs") allege the following based upon the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Digiliti Money Group, Inc., f/k/a Cachet Financial Solutions, Inc. (referred to herein as "Digiliti Money" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs purchased or otherwise acquired Digiliti Money securities, including Digiliti Money common stock, preferred stock and convertible debt securities. Plaintiffs seek to pursue remedies under §§11 and 15 of the Securities Act of 1933 ("1933 Act"), for their purchases of Digiliti Money common stock pursuant and/or traceable to the Registration Statement and Prospectus (the "Offering Documents") issued in connection with Digiliti Money's public stock offering on or about March 10, 2017 (the "Offering"). In addition, Plaintiffs also bring this action for common law fraud arising out of their purchases

- 1 -

of Digiliti Money securities and convertible notes between October 21, 2016 and August 4, 2017.

2.     Between August 9, 2016 and August 17, 2017 (the "Relevant Period"), defendants issued materially false and misleading statements regarding the Company's financial results in their public statements, marketing materials, SEC filings and Company conference calls with investors. Plaintiffs relied upon defendants' false and misleading statements regarding the state of Digiliti Money's business in making their decisions to purchases the Digiliti Money securities at issue.

3.     Throughout the Relevant Period, defendants issued materially false and misleading statements and/or omitted to state other facts necessary to make the statements made not misleading regarding the state of Digiliti Money's business with the intent of inducing Plaintiffs to purchase Digiliti Money securities and continue to invest additional money into the Company.   Specifically, Digiliti Money announced contracts with its customers for products and services that the Company had no ability or intention to fulfill for the purpose of artificially inflating Digiliti Money's financial results at the ends of fiscal quarters.   Digiliti Money recognized revenue from contracts that promised to deliver products and services that the Company knew did not exist or that it would not be able to develop in time to meet its obligations and projections. The Company presold its services to customers, by which the Company would agree to provide future services in exchange for an upfront payment.   But, in order to artificially boost its revenue, the Company would recognize 90% of the total contract amount in the current quarter – despite the fact that the Company knew it would not be able to fulfill its obligations.   Such upfront revenue

recognition violated Generally Accepted Accounting Principles ("GAAP"). This improper revenue recognition resulted in the Company improperly or prematurely recognizing material amounts of revenue.

4.     In addition, because the defendants knew they needed to show a steady growth trajectory in order to raise more money from outside sources, such as Plaintiffs, the revenue goal for every new quarter was necessarily even more artificially inflated than the last. This practice led to the need to presell additional services in the next quarter, as the Company had pulled in hundreds of thousands of dollars in recognized revenue from future quarters.

5.     Defendants disseminated these false revenue numbers – which had no relationship to the Company's actual cash flows – in order to maintain the charade that the Company was a going concern, because they believed that if they could keep the Company afloat long enough to complete a successful public offering in early 2017 and get the Company's stock "up listed" from an over the counter "penny stock" to the NASDAQ Capital Market ("NASDAQ"), they would raise enough cash to cover up their fraud. As the Company explained in its 2016 10-K, filed on February 24, 2017:

> Our common stock is currently quoted on the OTCQB Marketplace under the symbol "CAFN." Our common stock is currently not listed on any stock exchange and there is currently a very limited trading market for our common stock on the OTCQB Marketplace. We have applied to list our common stock on the Nasdaq Capital Market under the symbol "CAFN," which listing we expect to occur upon consummation of our Offering. In order for our common stock to be approved for listing on the Nasdaq Capital Market, we will need to satisfy certain qualitative and quantitative requirements, including having at least $5,000,000 of stockholders' equity.

6.     Defendants successfully completed the Offering on or about March 10, 2017, raising approximately $8.8 million in net proceeds for the Company. This influx of cash

allowed defendants to continue the fraudulent scheme and wrongful course of business alleged herein for several more months. But even the funds raised in the Offering could not conceal defendants' fraud forever, and eventually the house of cards collapsed.

7.      One of the customers that Digiliti Money used to artificially inflate its revenue was National Check & Currency ("NCC"). On May 12, 2015, the Company publicly announced an agreement with NCC for Digiliti Money's remote deposit capture ("RDC") product in 3,000 of NCC's locations. NCC became an important customer of Digiliti Money and contributed a material portion of Digiliti Money's reported revenue for 2016, which reported revenue was included in the Offering Documents.

8.      During January 2017, just as the Company was preparing for the Offering, NCC informed Digiliti Money management, including defendant Jeffrey C. Mack ("Mack"), the Company's Chief Executive Officer ("CEO") at the time of the Offering, that it wished to cancel its contract with the Company. Such a cancellation was a death knell for Digiliti Money's plans for the Offering, as it would have exposed the Company's use of improper revenue recognition. In order to keep Digiliti Money's false revenue scheme going until the Offering, CEO Mack was able to convince NCC to delay the cancellation until April 30, 2017 – just after the Offering. In exchange, Mack promised NCC a credit of $50,000 to delay the cancellation, which it did.

9.      Once NCC collected its $50,000 credit and cancelled its contract with Digiliti Money on April 30, 2017, the Company's scheme of falsifying its revenues began to unravel. On August 4, 2017, Digiliti pre-released its expected second quarter 2017 results, disclosing that its revenues for the quarter would be in the range of $1.1 to $1.3 million, well below

- 4 -

analyst estimates of $3 million. The Company also disclosed that a large customer with a number of implementations (now known to be NCC) had terminated its contract with the Company and that Digiliti Money expected to book a $1.8 million loss reserve against accounts receivable. Along with the pre-release the Company also announced that Mack had resigned.

10.     The Company issued a press release and filed a Form 8-K with the SEC on August 14, 2017 announcing that on August 12, 2017, its auditor, Lurie, LLP ("Lurie"), had informed it that "reliance should not be placed on" Digiliti Money's financials for the year ended December 31, 2016 and the quarter ended March 30, 2017, and that Lurie had "withdrawn their audit reports on the Company's consolidated financial statements for the year ended December 31, 2016" due to information related to "revenue and accounts receivable included in those same consolidated financial statements." The Company also announced that it had initiated an internal investigation regarding potential accounting irregularities.   In direct response to those disclosures, Digiliti Money common stock plummeted, closing at $0.19 per share on August 15, 2017 on an extremely heavy trading volume, causing damages to Plaintiffs.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o. This Court has jurisdiction over this action pursuant to §22 of the 1933 Act, 15 U.S.C. §77v, and 28 U.S.C. §1331.

12.     Venue is properly laid in this District pursuant to §22 of the 1933 Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

14.     Plaintiff Tiburon Opportunity Fund LP ("Tiburon") is a Delaware company domiciled in Washington. Tiburon purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby. Tiburon also purchased or otherwise acquired Digiliti Money common stock pursuant and/or traceable to the Offering.

15.     Plaintiff Sydne and Allan Bortel Living Trust ("Bortel Living Trust") is domiciled in California. Bortel Living Trust purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

16.     Plaintiff Cross River Partners LP ("Cross River") is a Delaware company domiciled in Connecticut. Cross River purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

- 6 -

17.     Plaintiff Anglian Holdings LLC ("Anglian") is a Delaware company. Anglian purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

18.     Plaintiff Columbus Capital Partners, L.P. ("Columbus LP") is a partnership organized under the laws of California and domiciled in California. Columbus LP purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

19.     Plaintiff Columbus Capital QP Partners, L.P. ("Columbus QP") is a partnership organized under the laws of Delaware and domiciled in California. Columbus QP purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

20.     Plaintiff Rovida West Coast Investments Ltd. ("Rovida") is located in California. Rovida purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

21.     Plaintiff FLMM, Ltd. ("FLMM") is a Bermuda company domiciled in Texas. FLMM purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

22.     Plaintiff London Family Trust ("London Trust") is domiciled in California. London Trust purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby. London Trust also purchased or otherwise acquired Digiliti Money common stock pursuant and/or traceable to the Offering.

- 7 -

23.     Plaintiff Jon D. and Linda W. Gruber Trust ("Gruber Trust") is domiciled in California.  Gruber Trust purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto was damaged thereby.  Gruber Trust also purchased or otherwise acquired Digiliti Money common stock pursuant and/or traceable to the Offering.

24.     Plaintiff AnKap Partners, LP ("AnKap") is domiciled in New York.  AnKap purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.  AnKap purchased or otherwise acquired Digiliti Money common stock pursuant and/or traceable to the Offering.

25.     Plaintiff Robert S. Anderson ("Anderson") is domiciled in New York.  Anderson purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

26.     Plaintiff Anderson Family Foundation ("Anderson Foundation") is domiciled in New York.  Anderson Foundation purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

27.     Plaintiff Lucy Lyden Anderson ("Lucy Anderson") is domiciled in New York.  Lucy Anderson purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

28.     Plaintiff Robert J. Anderson Trust ("Robert Anderson Trust") is domiciled in New York.  Robert Anderson Trust purchased or otherwise acquired Digiliti Money

securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

29.     Plaintiff Ward Stephen Anderson Trust ("Ward Anderson") is domiciled in New York. Ward Anderson purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

30.     Plaintiff John L. Anderson Trust ("John Anderson Trust") is domiciled in New York. John Anderson Trust purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

31.     Plaintiff Lyden Family Trust ("Lyden Trust") is domiciled in Connecticut. Lyden Trust purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

32.     Plaintiff John P. Lyden ("John Lyden") is domiciled in Connecticut. John Lyden purchased or otherwise acquired Digiliti Money securities during the Relevant Period as set forth in Exhibit A attached hereto and was damaged thereby.

**Defendants**

33.     Defendant Digiliti Money provides cloud-based software-as-a-service ("SaaS") financial technology ("fintech") solutions to the financial services industry in the United States. Digiliti Money was previously called Cachet Financial Solutions, Inc. ("Cachet"). In October 2016, the U.S. District Court for the Central District of California found that the Company's use of this name infringed on the federal trademark registration of an entity

- 9 -

named Cachet Banq and enjoined the Company from using the Cachet term. The Company was rebranded as Digiliti Money on April 6, 2017. The Company is a Delaware corporation headquartered in Minneapolis, Minnesota. Following the Offering, Digiliti Money common stock up-listed to the NASDAQ under the ticker symbol "DGLT." As of December 31, 2016 the Company had approximately 63 full-time employees.

34.     Defendant Mack was, at the time of the Offering, CEO, President and Chairman of the Board of Digiliti Money. In August 2017, defendant Mack resigned from the Company.

35.     Defendant Bryan D. Meier ("Meier") is, and was at the time of the Offering, Executive Vice President and the Chief Financial Officer ("CFO") of Digiliti Money.

36.     Defendant James L. Davis ("Davis") is, and was at the time of the Offering, a director of Digiliti Money.

37.     Defendant Michael J. Hanson ("Hanson") is, and was at the time of the Offering, a director of Digiliti Money.

38.     Defendant Rod Jardine ("Jardine") is, and was at the time of the Offering, a director of Digiliti Money.

39.     Defendant Darin P. McAreavey ("McAreavey") was, at the time of the Offering, a director of Digiliti Money. Defendant McAreavey resigned as a director of the Company on August 29, 2017.

40.     Defendant Ruth Owades ("Owades") is, and was at the time of the Offering, a director of Digiliti Money.

41.     Defendant Liyuan Woo ("Woo") was, at the time of the Offering, a director of Digiliti Money.  Defendant Woo resigned as a director of the Company on March 22, 2017.

42.     Defendant James J. Spencer ("Spencer") is, and was at the time of the Offering, a director of Digiliti Money.

43.     Defendant Robin S. O'Connell ("O'Connell") was, at the time of the Offering, a director of Digiliti Money.  Defendant O'Connell resigned as a director of the Company on September 7, 2017.

44.     The defendants referenced above in ¶¶34-43 are referred to herein as the "Individual Defendants."  The Individual Defendants each signed or authorized the signing of the false and misleading Registration Statement used to conduct the Offering.  The defendants referenced above in ¶¶34-35 are or were executives of Digiliti Money who pitched the Offering to investors at the directive of the Company and the Underwriter Defendants (defined below).

45.     Defendants Lake Street Capital Markets, LLC ("Lake Street") and National Securities Corporation ("National Securities"), a wholly-owned subsidiary of National Holdings, Inc., are investment banking firms that acted as underwriters of Digiliti Money's Offering, helping to draft and disseminate the Offering Documents (the "Underwriter Defendants").  Lake Street and National Securities, as co-lead book-running managers of the Offering, conducted the Offering from this District.  Lake Street is headquartered in Minnesota and National Securities has headquarters in New York and Washington.  Pursuant to the 1933 Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the Offering and shared at least $735,000 in fees collectively.

(b)     The Underwriter Defendants also demanded and obtained an agreement from Digiliti Money that it would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Digiliti Money had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted Digiliti Money and the Individual Defendants in planning the Offering and purportedly conducted an adequate and reasonable investigation into the business and operations of Digiliti Money, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the Offering. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Digiliti Money's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Digiliti Money's lawyers, management and top executives and engaged in "drafting sessions" between at least January 2017 and March 2017. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which Digiliti Money stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Digiliti Money would be made in

- 12 -

the Registration Statement; and (v) what responses would be made to the SEC in connection

with its review of the Registration Statement. As a result of those constant contacts and

communications between the Underwriter Defendants' representatives and Digiliti Money

management and top executives, the Underwriter Defendants knew, or should have known,

of Digiliti Money's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be

filed with the SEC and declared effective in connection with offers and sales thereof,

including to Plaintiffs.

## STATEMENT OF THE CASE

46.     Digiliti Money is a Minnesota-based technology solutions and services

company that provides cloud-based SaaS fintech solutions to the financial services industry

in the United States. It provides Select Mobile Money, a prepaid mobile money platform

that links various mobile banking features with a prepaid debit card issued by financial

institutions or alternative financial service providers. The Company also offers RDC

products, including Select Business Merchant Capture, which provides the ability to scan and

deposit checks from a PC, Mac desktop computer or mobile device; Select Mobile Deposit,

which provides the ability to deposit checks anywhere and anytime by taking a picture of the

front and back of the endorsed check using a mobile device; and Select Mobile Deposit-

Express, a standalone version of Select Mobile Deposit for iPhone and Android phones to

minimize start-up costs and simplify deployment of mobile deposit for small financial

institutions. In addition, it offers Select Mobile NowPay, a remote payment capture solution

that enables financing companies and other lenders to offer services for making a payment

on a loan or other recurring debt by using an app on a smartphone and taking a photo image of their check and transmitting it to the payee; and Select Mobile Account Opening, a solution that streamlines the account opening process by utilizing photo imaging to capture customer data and auto-populate an account opening application form for checking, savings, credit card and other types of accounts. The Company serves banks, credit unions and alternative financial service providers, including providers of non-traditional banking services, such as reloadable prepaid cards and check cashing services.

47. Throughout the Relevant Period, defendants issued materially false and misleading statements and omitted material facts regarding the state of Digiliti Money's business. Former Digiliti Money employees have confirmed that Digiliti Money entered into contracts with its customers for products and services that the Company had no ability or intention to fulfill for the purpose of artificially inflating Digiliti Money's financial results at the ends of fiscal quarters. These former employees have also confirmed that Digiliti Money recognized revenue from contracts that promised to deliver products and services that the Company knew did not exist or that it would not be able to develop in time to meet its obligations.

48. CW1, a former Product Manager for Cachet from April 2015 through September 2016, whose job duties included managing the Company's relationships with certain of its customers, including NCC, stated that the Company entered into contracts that were internally termed "rogue" or "ghost" contracts with almost all of its customers (including NCC) by which the Company promised to deliver products that it knew did not exist, that it had no intention of developing, and that it would not be able to develop in time

- 14 -

to meet its obligations. According to CW1, the Company's Vice President of Sales, Larry Blaney, who reported directly to then-CEO Mack, approved these "rogue" or "ghost" contracts simply to boost the Company's quarterly revenue in order to make the sales numbers appear better than they actually were, and the contracts were for products that the Company did not currently offer and had no intention of developing. According to CW1, the Company never even attempted to develop any of the products or services described in these "rogue" or "ghost" contracts.

49.     CW2 was a former Core Products Solutions Manager at Digiliti Money from mid-2014 through August 2017. CW2 stated that before leaving the Company, CW2 was conducting a review of open contracts and discovered contracts between Digiliti Money and NCC worth about $1 million that had never been submitted to the Company's project management team, and that the contracts were for multiple platforms and multiple programs that had not been developed yet, nor had there been any discussion with the product management team about their development. For example, NCC had one contract for a Digiliti Money product called Account Opening, but what NCC required in that project had never been contemplated by the Company's product team because it involved integration with different operating systems and that was not the product they were building. In other cases, the contracts were so vague that Digiliti Money was obligated to build products that NCC wanted, even though they were not products the Company had the ability to provide. CW2 stated that contracts for custom work, such as that contemplated in the contracts with NCC, required prior input from the product management team because the team was required to evaluate the customer's requirements and provide an estimate of time and price before the

contract could be executed. This process was not followed with the NCC contracts. CW2 also stated that the revenue from these NCC contracts CW2 reviewed had been taken by the Company, despite the fact that it had no ability to deliver on its obligations.

50. CW3 was a former customer success manager at Digiliti Money from mid-2014 through July 2017. CW3's job responsibilities included working with clients on technical implementation of their software, conducting staff training, doing some marketing, being a liaison during the test phase, and then once the project had been fully implemented, remaining as the point of contact for the client and the Company and managing the relationship on an ongoing basis. CW3 stated that the Company "absolutely [did] not" have the services offered to its customers developed and available, and that while the Company would claim at times it had a dozen live products, in fact it had about four.

51. CW4 was a director of software development for the Company from October 2015 until November 2016, and reported directly to the Chief Information Officer ("CIO"), Bruce Whitmore ("Whitmore"), who was responsible for controlling revenue recognition for software sales for custom development services, which was the vast majority of revenue for Digiliti Money. According to CW4, the Company would "presell" its services to customers, by which the Company would agree to provide services over a period of time in the future, in exchange for an upfront payment. For example, according to CW4, the Company would enter into a contract for $400,000 for future services and the customer would agree to pay $50,000 immediately. But, in order to boost its revenue, the Company would recognize 90% of the $400,000 in the current quarter, despite the fact that the Company would not be able to fulfill its future obligations to the customer.

52. According to CW4, the CIO received extreme of pressure from defendant Mack, the CEO, to recognize the revenue from these contracts before the Company had even started the project, because the Company was ramping up for the Offering, and had been for a couple of years, and needed to show a steady growth trajectory in order to raise more money from investors. CW4 stated that the Company was running off of this revenue number – which had no relationship to the actual cash flow – because, as defendant Mack explained, the intention was that if they could just make it to a liquid equity market, they could raise so much cash so quickly that "the call will cover all bets."

53. According to CW4, this premature revenue recognition from preselling resulted in the Company borrowing a significant amount of revenue from future quarters and creating a revenue hole which got bigger every quarter. Whitmore would always brag about his ability to hit the forecast, but was only able to hit the forecast because he was controlling the number through premature revenue recognition. According to CW4, Whitmore would change the revenue number to make sure he hit the goal, which would result in the goal for the next quarter necessarily being even more ridiculous because the Company would have used hundreds of thousands of dollars in recognized revenue that they pulled in and could not replace. This practice perpetuated the need to presell additional services in the next quarter.

54. According to CW4, the Company entered into these "presale" contracts with NCC and other customers in order to meet its numbers for the quarter, and CW4 estimated there were around 20 contracts that were entered into for products that were never delivered to production. The vast majority of new contracts were for products that did not yet exist.

However, revenue was recognized on those contracts regardless. In addition, deals were entered into with companies, like Ingo, that explicitly presold the companies large numbers of licenses at a big discount to cover the next year and half, simply in order to generate a big bump in revenue for the Company so that defendants could continue to claim to investors that the Company was growing.

55. During January 2017, just as the Company was preparing for the Offering, NCC informed Digiliti Money management, including defendant Mack, that it was cancelling its contract with the Company. Such a cancellation was a death knell for Digiliti Money's plans for the Offering, as the revenue from NCC's contract was a material amount for the Company and the loss of that revenue would expose the Company's use of improper revenue recognition and leave it woefully short of cash. In order to keep Digiliti Money's false revenue scheme going until the Offering, CEO Mack was able to convince NCC to delay the cancellation of the contract until April 30, 2017 – just after the Offering. In exchange, Mack promised NCC a credit of $50,000 to delay the cancellation, which it did.

## DEFENDANTS INDUCED PLAINTIFFS TO INVEST IN DIGILITI MONEY IN ORDER TO KEEP THEIR FRAUDULENT SCHEME GOING

56. In order to raise enough cash to keep Digiliti Money afloat and to cover up defendants' fraudulent scheme and course of business during the Relevant Period, the Company needed to raise funds from investors, such as Plaintiffs. One way that the Company raised money was through a Securities Purchase Agreement ("SPA"), by which the Company sold investors a convertible note and warrants to purchase Digiliti Money common shares. According to the convertible note, which was attached as an exhibit to the SPA, the principle amount of the note could be converted to Digiliti Money common shares

at a rate equal to the lower of (i) $7.00 per share or (ii) 80% of the Company's per share price in the next underwritten public offering. The Company had the right to require the holder of the convertible note to convert its balance to common shares if Digiliti Money's shares became listed on the NASDAQ.

57.     Starting on October 21, 2016, the Company entered into an SPA with certain Plaintiffs for the following amounts:

| Plaintiff | Subscription Amount | Number of Warrants |
|---|---|---|
| Tiburon | $500,000 | 85,349 |
| Columbus LP | $578,000 | 98,663 |
| Columbus QP | $122,000 | 20,825 |
| FLMM | $1,650,000 | 281,650 |
| Gruber Trust | $500,000 | 85,349 |
| Bortel Living Trust | $150,000 | 25,605 |
| London Trust | $300,000 | 51,209 |
| Cross River | $2,000,000 | 379,327 |
| Anglian | $500,000 | 85,349 |

58.     Plaintiffs relied upon defendants Digiliti Money's, Mack's and Meier's false and misleading statements, including representations made in the SPA, the Company's marketing materials and the Company's SEC filings, in making their decision to purchase the above promissory notes. For example, pursuant to the terms of the SPA, the Company made certain representations and warranties to the above Plaintiffs, including that all of the Company's SEC filings "complied in all material respects with the requirements of the [1933] Act and the Exchange Act . . . and none of the SEC Reports, when filed, contained any untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances

under which they were made, not misleading." The SPA also made the representation and warranty that all of the Company's financial statements had "been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved ('GAAP')."

59.     In addition, the Company provided certain of the Plaintiffs with marketing materials, such as power point "pitch books," in order to induce them to enter into the SPA. These marketing materials included false and misleading statements regarding the Company's "[r]ecord revenue growth and growing pipeline," including falsely stating that the Company had more than \$2.3 million in revenue in the third quarter of fiscal year 2016, up from more than \$2 million in the second quarter of 2016. As set forth in ¶77, these statements were materially false and misleading or omitted to state other facts necessary to make the statements made not misleading.

60.     All of the shares listed in ¶57 above were converted to Digiliti Money common shares after the Company was listed on the NASDAQ in March 2017.

### DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS TO PLAINTIFFS AND FRAUDULENTLY CONCEALED FACTS TO HIDE DIGILITI MONEY'S TRUE FINANCIAL CONDITION

61.     Defendants made numerous false statements to Plaintiffs and concealed facts from Plaintiffs in connection with the sale of the securities at issue in this case. Defendants made these false statements in writing in the materials they used to market the securities they sold to Plaintiffs and in the statements they made to the market about the condition of the Company.

62.     On August 9, 2016, the Company issued a press release announcing its financial results for the quarter ended June 30, 2016 ("Second Quarter 2016 Earnings Release"). Specifically, the Second Quarter 2016 Earnings Release stated:

Revenue in the second quarter of 2016 increased 100% to a record $2.0 million from $1.0 million in the second quarter of 2015. The improvement was driven by an increase in the number of transactions and an increase in the number of product and product enhancement deployments completed in the quarter. The improvement was also due, in part, to an increase in recurring revenue from the company's Select Mobile Money products.

\*     \*     \*

"Q2 was a record quarter for us across the board," said Cachet Financial Solutions' CEO Jeffrey Mack. "Our revenue doubled year-over-year to slightly over $2.0 million, crossing this threshold for the first time. We deployed more products in Q2 than in any prior quarter, and continued to see a year-over-year increase in recurring revenue, number of transactions, and total products sold. We were able to sell more products in Q2 than we have sold in any prior quarter due to our sales initiatives and expanded product portfolio. Our prepaid programs, in particular, led the way with key wins from Rapid Financial and Dollar Financial, the latter of which marks our first ever entry into the Canadian market."

"Given our progress with bringing some of our current clients live and new clients into the pipeline, we believe we continue to be on track to meet our 2016 revenue guidance of $8 to $10 million, which reflects a revenue growth rate of 84% to 132% compared to 2015. We expect our recurring revenue will continue to increase during the second half of 2016, and possibly resulting in our total recurring revenue for 2016 to double compared to 2015."

63.     On August 9, 2016, the Company hosted a conference call with securities analysts and investors to discuss the Company's financial results for the quarter ended June 30, 2016 ("Second Quarter 2016 Conference Call"). During the Second Quarter 2016 Conference Call, defendants Mack and Meier reaffirmed the financial results reported in the Second Quarter 2016 Earnings Release and touted the Company's sales growth. Specifically, Mack stated:

Q2 was a record quarter for us virtually across the board. Our revenue doubled year-over-year to slightly over $2 million, crossing this important threshold for the first time in our history. We had more customers live during this quarter than in any quarter before and continue to see a year-over-year increase in many of our key metrics, including recurring revenue, number of transactions and total products sold. We believe this marks a significant turning point for us, given the progress we've made this year and in particular this quarter.

To put our progress into a financial context, we generated in Q2 nearly all of the revenue we did in the entire year 2013. Extending this comparison to consider the first half of 2016, we generated in this period more than 80% of the entire revenue we did for all of last year. Given the fact that our operating expenses remain relatively flat during the quarter on a year-over-year basis, our strong top line growth help us further expand the delta between our revenue and expenses. It goes without saying that this leverage in our business model has been an important reason why we've been able to scale as a company and will continue to play a role in our future growth.

Looking at some of our particular successes in Q2, we're encouraged by the traction we gained in both the products and customer fronts. ***Because of our sales initiatives and expanded product portfolio, we were able to sell more products in Q2 than we've ever done in any single quarter.***

\*     \*     \*

The overall result has been an all-around excellent quarter that gives us greater confidence in reaching our financial goals for 2016, which include doubling our recurring revenue and generating between $8 million and $10 million of revenue for the full year.

\*     \*     \*

Given these strong results for both the quarter and the half, as well as where we are, with bringing some of our current customers live and bringing new customers into the pipeline, we believe we are on track to meet our 2016 revenue guidance of $8 million to $10 million. This amounts to a revenue growth rate of 84% to 132% as compared to 2015.

In conjunction with this, we're continuing to expect recurring revenue to accelerate during the second half of the year, which should lead to a recurring revenue doubling for 2016.

64.     On the Second Quarter 2016 Conference Call, defendant Meier stated:

In the second quarter of 2016, our revenue increased 100% to a record $2 million from $1 million in the same year-ago quarter. This growth was driven primarily by an increase in the number of transactions on our platform, an increase in the number of products and product enhancement deployments completed in the quarter. The increase was also due in part to increase in recurring revenue from our Select Mobile Money solutions.

\*       \*       \*

Recurring revenue in the second quarter of 2016 from RDC and Select Mobile Money products, which include monthly active user fees as well as ongoing monthly maintenance and hosting fees, reached a record $1.5 million, or 73.5% of total revenue. This is up 42% from the prior quarter and up 79% from the second quarter of 2015. We believe recurring revenue is an important metric by which to measure our progress since many of our solutions are designed to secure a healthy stream of long-term revenue.

As we continue to activate our existing customers under contract, we expect recurring revenue to increase accordingly. To add to that, any new sales of our key products like RDC, Select Mobile Money, NowPay and Mobile Photo Account Opening are expected to accelerate that recurring revenue growth even further.

\*       \*       \*

As Jeff mentioned on our last call, we have a lot inherent growth embedded in our business model. Because we currently have many signed customers under contract, we are still in the process of deploying our solutions for their consumers to use. As we help these customers accelerate these deployments, we will begin to see much of that embedded growth fully reflected in our financial results, especially in our recurring revenue.

However, in addition to generating recurring revenue stream once the customer is live, we also generate revenue in the form of upfront payments when we actually implement a particular solution to a customer.

It's important to note that we are required to amortize these fees into revenue on a straight line basis over the life of the contract, which is typically three years. At the end of the second quarter, we had a deferred revenue balance of approximately $1.1 million.

65.     On the Second Quarter 2016 Conference Call, defendant Mack stated in response to an investor question:

[Q – Peter Bortel:]  And a question to Jeff, perhaps you can address this. We went from $1.5 million to $2 million kind of 33% quarter-over-quarter growth that we've been seeing from the company up from $1 million or $1.1 million a quarter before that. Is there anything special when I model this out or can I continue to model 33% growth per quarter, bringing us to like $9.5 million for the year? Anything special in this quarter that we won't see in future quarters?

[A – Mack:]  I don't know if there's anything special. I think, as I said, our guidance is still out there at $8 million to $10 million. We haven't changed that. You're going to continue to see the growth within our prepaid side of our business so that will have an impact on future revenues. There typically larger transactions are going to be – they should have a nice positive impact on the revenue side and conversely margins may be impacted slightly, but that would probably be the only significant change you might see. We have recently in the white-label side of our business seen a number of professional services coming onboard, which is an upfront opportunity for us from the standpoint of revenue as well as the long-term impact of installing that technology with those customers.

66.     On August 15, 2016, the Company filed with the SEC its quarterly report on

Form 10-Q for the period ended June 30, 2016 (the "Second Quarter 2016 10-Q").

Defendant Meier signed the Second Quarter 2016 10-Q and defendants Mack and Meier

certified it pursuant to the Sarbanes-Oxley Act of 2002.  The Second Quarter 2016 10-Q

reiterated the financial results reported in the Second Quarter 2016 Earnings Release.

67.     Under the heading "Critical Accounting Policies," the Second Quarter 2016

10-Q represented that the Company's financial statements were prepared in accordance with

GAAP:

Our condensed consolidated financial statements include our accounts and the accounts of our wholly-owned subsidiary, Cachet Financial Solutions Inc. Our wholly-owned subsidiary is the only entity with operational activity, and therefore no intercompany transactions exist with the parent entity which would need to be eliminated. We have prepared our condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America ("GAAP").

Our consolidated financial statements have been prepared on the basis that we will continue as a going concern.

*Revenue Recognition*

We generate revenue from the following sources:

- up-front implementation fee;

- professional service fees; and

- recurring revenue, comprising of monthly hosting/maintenance fee, monthly user fees and transaction fees.

We commence revenue recognition for fees earned on our SaaS fintech solutions and services when all of the following criteria are met:

- there is persuasive evidence of an arrangement;

- the service has been or is being provided to the client;

- collection of the fees is reasonably assured; and

- the amount of fees to be paid by the client is fixed or determinable.

68.     On November 10, 2016, the Company issued a press release announcing its

financial results for the quarter ended September 30, 2016 ("Third Quarter 2016 Earnings

Release"). Specifically, the Third Quarter 2016 Earnings Release stated:

**Q3 2016 Financial Results**

Revenue in the third quarter of 2016 increased 124% to a record $2.3 million from $1.0 million in the third quarter of 2015. The improvement was driven by an increase in recurring revenue from the company's RDC products, increase in the number of transactions, and increase in the number of product and product enhancement deployments completed in the quarter.

\*     \*     \*

"After reporting a milestone quarter in Q2, we're pleased to report yet another record quarter in Q3," said Cachet Financial Solutions' CEO Jeffrey Mack. "Revenue grew to its highest level ever, reflecting the continued growth of our core RDC business, as well as the expansion of our Select Mobile

Money business, which is increasingly taking a larger share of the massive prepaid market. We also matched a company record for recurring revenue during the quarter and achieved new records in both transactions and total products sold. This last achievement, in particular, validates some of the work we've done over the year to build out our sales force and enhance our platform, so that we can take advantage of every market opportunity available to us.

"What's perhaps most encouraging is that even though we increased our investments to support this higher level of growth, our topline continued to accelerate faster than our expenses, reaffirming once again the significant leverage in our business model. In fact, gross margins for the quarter reached a record 42.2%, beating our previous record of 27.3% reported in the prior quarter. On top of that, our adjusted EBITDA continued to improve, which shows that while we are focused heavily on growth, our business is set up to be profitable, once we scale our revenue and leverage our fixed costs even further.

69.    On November 10, 2016, the Company hosted a conference call with securities analysts and investors to discuss the Company's financial results for the quarter ended September 30, 2016 ("Third Quarter 2016 Conference Call").  During the Third Quarter 2016 Conference Call, defendants Mack and Meier reaffirmed the financial results reported in the Third Quarter 2016 Press Release and touted the Company's sales growth. Specifically, Mack stated:

After reporting a milestone quarter in Q2, we're pleased to report yet another record quarter in Q3. Starting at the top, revenue grew to its highest level ever at $2.3 million, reflecting the continued growth of our core RDC business as well as the expansion of our Select Mobile Money business, which is increasingly taking a larger share of the massive prepaid market. We also matched the company record for recurring revenue during the quarter and achieved new records in both transactions and total products sold. This last achievement, in particular, validates some of the work we've done over the year to build out our sales force and enhance our platform so that we can take advantage of every market opportunity available to us.

70.     On the Third Quarter 2016 Conference Call, defendant Meier stated:

Recurring revenue in the third quarter of 2016 from our RDC and Select Mobile Money products, which include monthly active user fees as well as ongoing monthly maintenance and hosting fees, matched the company record of $1.5 million or 64.8% of total revenue. This is up slightly from the prior quarter and up 76% from the third quarter of 2015.

As we've talked about before, recurring revenue is an important metric for us because so many of our solutions are designed to secure a healthy stream of long-term revenue. As we continue to activate our existing customers under contract, we expect recurring revenue to increase accordingly. On top of that, any new sales of our key products like RDC and Select Mobile Money or our newer products like NowPay and Mobile Account Opening, are expected to accelerate their recurring revenue growth even further.

*It's important to note that we have many signed customers under contract who are still in the process of deploying our solutions for their consumers to use. As a result, even though we can't recognize revenue now, there is still lot of inherent revenue growth embedded in our business. As we help these customers accelerate these deployments, we will begin to see much of that embedded growth fully reflected in our financial results, especially in our recurring revenue.*

71.     On November 14, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2016 (the "Third Quarter 2016 10-Q"). Defendant Meier signed the Third Quarter 2016 10-Q and defendants Mack and Meier certified it pursuant to the Sarbanes-Oxley Act of 2002. The Third Quarter 2016 10-Q reiterated the financial results reported in the Third Quarter 2016 Earnings Release.

72.     The Third Quarter 2016 10-Q represented that the Company's financial statements were prepared in accordance with GAAP, stating that "[t]he accompanying condensed consolidated financial statements of the Company included herein were prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP') for interim financial information and with the instructions to the Quarterly Report

on Form 10-Q and Articles 8 and 10 of Regulation S-X," and made the following

representations regarding the Company's revenue recognition policy:

*Revenue Recognition*

We generate revenue from the following sources:

- up-front implementation fee;

- professional service fees; and

- recurring revenue, comprising of monthly hosting/maintenance fee, monthly user fees and transaction fees.

We commence revenue recognition for fees earned on our SaaS fintech solutions and services when all of the following criteria are met:

- there is persuasive evidence of an arrangement;

- the service has been or is being provided to the client;

- collection of the fees is reasonably assured; and

- the amount of fees to be paid by the client is fixed or determinable.

73.     On May 11, 2017, the Company issued a press release announcing its financial

results for the quarter ended March 31, 2017 ("First Quarter 2017 Earnings Release").

Specifically, the First Quarter 2017 Earnings Release stated:

**Q1 2017 Financial Results**

Revenue in the first quarter of 2017 increased 73% to a record $2.5 million from $1.5 million in the first quarter of 2016. The improvement was driven primarily by an increase in professional services, and to a lesser extent, by an increase in recurring revenue from the company's RDC and Select Mobile Money solutions as a result of increased deployments, product enhancements, and transactions.

Recurring revenue from the company's RDC and Select Mobile Money products increased 35% to $1.4 million (56.2% of revenue) in the first quarter of 2017 from $1.1 million (71.9% of revenue) in the first quarter of 2016.

> Gross profit increased 171% to $837,000 (33.2% of revenue) in the first
> quarter of 2017 from $309,000 (21.2% of revenue) in the first quarter of 2016.

74.     On May 15, 2017, the Company filed with the SEC its quarterly report on

Form 10-Q for the period ended March 31, 2017 (the "First Quarter 2017 10-Q"). Defendant

Meier signed the First Quarter 2017 10-Q and defendants Mack and Meier certified it

pursuant to the Sarbanes-Oxley Act of 2002. The First Quarter 2017 10-Q reiterated the

financial results reported in the First Quarter 2017 Earnings Release.

75.     Under the heading "Critical Accounting Policies," the First Quarter 2017 10-Q

represented that "[a] discussion of our critical accounting policies was provided in Item 7 to

the Consolidated Financial Statements included in our Annual Report on Form 10-K as of

and for the year ended December 31, 2016 filed with the SEC on February 24, 2017. There

were no significant changes to these policies during the first quarter of 2017." The Company

stated in the Form 10-K filed on February 24, 2017 that the Company's financial statements

were prepared on "the accrual basis of accounting in accordance with accounting principles

generally accepted in the United States of America ('GAAP')," and made the following

representations regarding the Company's revenue recognition polices:

### Revenue Recognition

The Company generates revenue from the following sources:

- up-front implementation fees;

- professional service fees; and

- recurring revenue, comprising of monthly hosting/maintenance
fee, monthly user fees and transaction fees.

The Company commences revenue recognition for fees earned on its
solutions and services when all of the following criteria are met:

- there is persuasive evidence of an arrangement;

- the service has been or is being provided to the client;

- collection of the fees is reasonably assured; and

- the amount of fees to be paid by the client is fixed or determinable.

76.     Defendants also provided Plaintiffs with presentation materials in order to induce their investment in Digiliti Money securities. Plaintiffs relied upon these materials in making their decisions to invest. For example, defendants circulated an investor presentation slide deck entitled "(DGTL) The Now Way to Bank" in June 2017 ("June 2017 Presentation"). The June 2017 Presentation stated that the Company had $7.975 million in revenue in fiscal year 2016, and $5.269 in recurring revenue, with a gross margin of 32.3%. These revenue figures were allegedly an 85% increase from the prior year's revenue of $4.301 million and a gross margin of only 4.2%. The Company also stated that it was "[p]ositioned for strong growth in 2017 and beyond within core products from fully ramped 2016 'go-lives' and a record backlog of 281 solutions to be implemented." The June 2017 Presentation also claimed that the Company had "[a]pproximately 70% recurring revenue."

77.     The statements referenced above in ¶¶62-76 were each materially false and misleading because defendants failed to disclose and misrepresented the following adverse facts: (i) Digiliti Money had entered into contracts throughout the Relevant Period with customers for products and services that the Company had no ability or intention to fulfill for the purpose of artificially inflating Digiliti Money's financial results at the ends of fiscal quarters; (ii) Digiliti Money recognized revenue from contracts that promised to deliver products and services that the Company knew did not exist or that it would not be able to

develop in time to meet its obligations; (iii) by January 2017, the Company's management had received notice that one of its most important customers, NCC, which represented a material amount of revenue and accounts payable, had sought to cancel its contract, and that defendant Mack had offered a $50,000 refund if NCC would delay its cancellation until after the Offering; and (iv) as a result of the foregoing material misrepresentations and omissions, Digiliti Money's financial statements violated GAAP and SEC Regulations.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## IN THE OFFERING DOCUMENTS

78.     On or about January 20, 2017, Digiliti Money filed with the SEC a Registration Statement on Form S-1, which would later be utilized for the Offering following several amendments made in response to comments received from the SEC. The Form S-1 became effective on March 10, 2017.

79.     On or about March 13, 2017, Digiliti Money filed its final Prospectus, which forms part of the Registration Statement (the Prospectus and Registration Statement and all amendments are collectively referred to herein as the "Registration Statement").

80.     The Offering was successful for the Company and the Underwriter Defendants. At least 2,333,334 shares of Digiliti Money common stock were sold by the Company to the public at $4.50 per share, raising approximately $8.8 million in net proceeds for the Company, pursuant to the Offering.

81.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

82. Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

83. The Registration Statement positively described the then-current state of Digiliti Money's product development, revenues and accounts receivable without disclosing that the Company had been falsifying its revenue numbers through the use of "ghost" and "rogue" contracts with its customers and that a key customer had indicated it would cancel its contract with Digiliti Money, which put not only future revenues at risk but put in doubt the collectability of receivables.

84. The Registration Statement stated:

> As of December 31, 2016, we had entered into contracts for the sale of approximately 881 products (including product enhancements), of which approximately 600 were "active" as of December 31, 2016, meaning that the product or enhancement has been deployed or implemented by our client for use by its customers or that we have completed our implementation and/or customization work for the product or enhancement and have delivered it to our client for deployment.

85. The Registration Statement also stated in pertinent part as follows:

> The Company commences revenue recognition for fees earned on its solutions and services when all of the following criteria are met:
>
> - there is persuasive evidence of an arrangement;
>
> - the service has been or is being provided to the client;
>
> - collection of the fees is reasonably assured; and
>
> - the amount of fees to be paid by the client is fixed or determinable.

86. In the Notes to the Company's Consolidated Financial Statements included in the Registration Statement, with respect to Concentrations, the Company represented:

- 32 -

> During the year ended December 31, 2016, one customer represented $1.4 million, or 17.2% of the Company's consolidated revenues. . . . Within accounts receivable is a receivable from the same customer totaling $1.3 million, representing 42.8% of the Company's total receivables as of December 31, 2016. This receivable is due to the Company in various installments, pursuant to each agreement, beginning in January 2017 and ending in December 2019. As of December 31, 2015, the Company had receivables due from three customers of approximately $121,000, $113,000 and $95,000 representing 17.0%, 15.8% and 13.3%, respectively, of its gross accounts receivable balance.

87.     In the Offering Documents, Digiliti Money did not disclose that it was falsifying its revenue numbers through the use of "ghost" and "rogue" contracts with its customers, or that NCC had told Digiliti Money that it was going to cancel its contract in January 2017, but had been convinced to delay the cancellation until April 2017 (after the Offering) by the promise of $50,000 in credits.

88.     Under the rules and regulations governing the preparation of the Registration Statement, Digiliti Money was required to disclose at the time of the Offering that it was experiencing sales and operational deficiencies that were negatively impacting its profit margins and thus its profits, and that due to material defects in its internal controls and other accounting deficiencies, the Company was unable to accurately report, budget or forecast its financial results and prospects. The Registration Statement, however, contained no such disclosures. Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material

impact on Digiliti Money's profitability and, therefore, were required to be disclosed in the Registration Statement.

89. The Offering was successful for the Company and the Underwriter Defendants, who sold 2,333,334 shares of Digiliti Money common stock to the public at $4.50 per share, raising $10.5 million in gross proceeds ($8.8 million net of underwriting discounts, commissions and offering costs).

90. Plaintiff Tiburon acquired 20,000 shares pursuant and/or traceable to the Offering.

91. Plaintiff London Trust acquired 22,222 shares pursuant and/or traceable to the Offering.

92. Plaintiff Gruber Trust acquired 8,400 shares pursuant and/or traceable to the Offering.

93. Plaintiff AnKap acquired 100,000 shares pursuant and/or traceable to the Offering.

## THE TRUTH BEGINS TO EMERGE

94. On August 4, 2017, Digiliti Money pre-released its second quarter 2017 results, disclosing that its revenues for the quarter would be in the range of $1.1 to $1.3 million, well below analyst estimates of $3 million. Along with the pre-release, the Company also announced that CEO Mack had resigned and that Meier (the former CFO) had been appointed as the interim CEO. The release stated in part:

> Digiliti Money expects total revenue for the second quarter to be between $1.1 million and $1.3 million, compared to $2.0 million for the second quarter of 2016. The Company also expects an accounts receivable reserve in the amount of $1.8 million, due to the unilateral noncontractual

termination, shortly after the end of the second quarter of 2017, of a series of contracts by one customer. Digiliti Money is currently investigating its rights with respect to those customer contracts.

"Our topline for the quarter was lower than expected because our sales pipeline of potential customers at the start of the quarter did not result in new contracts and product implementations, such that expected revenue could be recognized in our Q2 results," said Digiliti Money's CFO Bryan Meier. "While we are on track to close a number of these deals in the second half of 2017, our progress will depend on how quickly we sign new customer contracts, how efficiently we implement new products and how effectively we retain potential customers in our sales pipeline." Mr. Meier continued, "It's encouraging to note the progress we made during the quarter. Specifically, we signed 27 new customers, sold 53 new products, and brought 45 products live during the quarter. The revenue from this activity will ramp up over time."

"In response to our revenue shortfall," Mr. Meier added, "we are in the process of implementing several cost-cutting initiatives, which we expect, on a full-year, continuing basis, to reduce our annual operating expenses by nearly $3 million when fully implemented by November 2017."

*     *     *

Due, in part, to the unilateral customer noncontractual termination, the Company's revenue shortfall and current level of operating expenses, Digiliti Money expects to seek financing to support its operations going forward. If the Company is not able to achieve a combination of such financing and sufficient positive cash flow from operations, in the near term, it may not be able to continue as a going concern.

95.   On August 14, 2017, the Company issued a press release and filed a Form 8-K with the SEC announcing that on August 12, 2017, its auditor, Lurie, had informed it that "reliance should not be placed on" Digiliti Money's financials for the year ended December 31, 2016 and the quarter ended March 30, 2017, and that Lurie had "withdrawn their audit reports on the Company's consolidated financial statements for the year ended December 31, 2016." The Company also announced that it had initiated an internal investigation regarding potential accounting irregularities.

96.     The Form 8-K stated, in pertinent part:

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**

(b) On August 12, 2017, Digiliti Money Group, Inc. (the "Company") received notification from its independent registered public accounting firm, Lurie, LLP (the "Firm") that it should disclose that reliance should not be placed on (i) the Firm's report relating to the Company's consolidated financial statements for the year ended December 31, 2016, and (ii) the Firm's completed interim review for the period ended March 31, 2017, and that the Firm has withdrawn their audit reports on the Company's consolidated financial statements for the year ended December 31, 2016, and revoked their consents to incorporate those reports in any and all registration statements.

While performing procedures for their review of the Company's financial statements for the quarter ended June 30, 2017, and in recent communications with the Company and its audit committee, the Firm became aware of information which relates to the Company's consolidated financial statements previously reported on by the Firm for the year ended December 31, 2016 and the quarter ended March 30, 2017. Certain of that information, disclosed to the Firm on August 11, 2017, of previously unknown information, relates to revenue and accounts receivable included in those same consolidated financial statements.

That information is, moreover, of a nature and from a source such that the Firm would have investigated it had it come to their attention during their audit and review procedures. Due to the recent discovery of the information, the Firm has not completed such an investigation, nor has the Firm had an opportunity to determine its potential impact on the Company's consolidated financial statements.

The Company's management and Audit Committee have discussed the matters disclosed in this Current Report on Form 8-K with the Firm.

97.     On August 15, 2017, Lurie resigned as the Company's independent registered public accounting firm.

98.     In direct response to the above disclosures, Digiliti Money common stock plummeted, closing at $0.19 per share on August 15, 2017 on extremely heavy trading volume, causing damages to Plaintiffs.

99.     On September 27, 2017, the Company issued a press release to announce it was

voluntarily delisting from NASDAQ and that it could no longer comply with SEC reporting

requirements.  The press release stated in part:

> The Company's Board of Directors has determined it would be in the
> best interests of the Company and its shareholders to voluntarily delist from
> Nasdaq. The Company believes its delisting would enhance its ability to
> continue to raise capital and consummate its current proposed financial
> restructuring and capital raising activities.
>
> The decision to delist from Nasdaq was also based on the good faith
> determination by the Board that it would not be able to: (i) timely comply with
> its periodic reporting requirements under the Exchange Act (Listing Rule
> 5250(c)), (ii) maintain the requisite stockholders' equity (Listing Rule
> 5550(b)(1), and (iii) maintain the corporate governance requirements that
> would require independent directors. The Company previously disclosed that
> it received a notice of noncompliance from the Listing Qualifications
> Department of Nasdaq in its Current Report on Form 8-K filed with the SEC
> on September 15, 2017.

100.    At the time of the filing of this action, Digiliti Money common stock was

trading over the counter at $0.08 per share, a decline of 98% from the Offering price.

## COUNT I

### For Violation of §11 of the 1933 Act
### on Behalf of Plaintiffs Tiburon, London Trust, Gruber Trust and AnKap
### Against All Defendants

101.    Plaintiffs incorporate ¶¶1-100 by reference.

102.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, against

all defendants on behalf of plaintiffs Tiburon, London Trust, Gruber Trust and AnKap.

103.    The Registration Statement for the Offering was inaccurate and misleading,

contained untrue statements of material fact, omitted to state other facts necessary to make

the statements made not misleading and omitted to state material facts required to be stated

therein.

- 37 -

104. Defendants are strictly liable to plaintiffs Tiburon, London Trust, Gruber Trust and AnKap for the misstatements and omissions.

105. None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading.

106. By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

107. Plaintiffs Tiburon, London Trust, Gruber Trust and AnKap acquired Digiliti Money common stock traceable to the Offering.

108. Plaintiffs Tiburon, London Trust, Gruber Trust and AnKap have sustained damages. The value of Digiliti Money common stock has declined substantially subsequent to and due to defendants' violations.

109. At the time of their purchases of Digiliti Money common stock, plaintiffs Tiburon, London Trust, Gruber Trust and AnKap were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs commenced this action.

## COUNT II

### For Violation of §15 of the 1933 Act
### on Behalf of Plaintiffs Tiburon, London Trust, Gruber Trust and AnKap
### Against the Company and the Individual Defendants

110. Plaintiffs incorporate ¶¶1-109 by reference.

111. This Count is brought pursuant to §15 of the 1933 Act against the Company

and the Individual Defendants on behalf of plaintiffs Tiburon, London Trust, Gruber Trust

and AnKap.

112. The Individual Defendants were each control persons of Digiliti Money by

virtue of their positions as directors and/or senior officers of Digiliti Money. The Individual

Defendants each had a series of direct and/or indirect business and/or personal relationships

with other directors and/or officers and/or major shareholders of Digiliti Money. The

Company controlled the Individual Defendants and all of Digiliti Money's employees.

## COUNT III

### For Fraud
### Against Defendants Digiliti Money, Mack and Meier

113. Plaintiffs incorporate ¶¶1-112 by reference.

114. Plaintiffs bring this claim against defendants Digiliti Money, Mack and Meier.

115. Defendants Digiliti Money, Mack and Meier made untrue statements of

material fact and omitted to state material facts necessary to make the statements made, in

light of the circumstances under which they were made, not misleading, including

misrepresentations and omissions regarding the state of Digiliti Money's business.

116. At the time the misrepresentations and misleading statements and omissions

were made to Plaintiffs, defendants Digiliti Money, Mack and Meier knew these statements

were false or misleading, or acted with a reckless disregard of, or without knowledge of, their truth and completeness, and these defendants made such misrepresentations and omissions with the intention to induce Plaintiffs to act in reliance thereon.

117.    In reasonable and actual reliance upon the false and misleading statements and omissions alleged herein, Plaintiffs were induced to and did invest in Digiliti Money securities.

118.    As a direct and proximate result of relying on defendants Digiliti Money's, Mack's and Meier's false and misleading statements and omissions, Plaintiffs suffered damages in an amount to be proved at trial.

## COUNT IV

### For Fraudulent Concealment
### Against Defendants Digiliti Money, Mack and Meier

119.    Plaintiffs incorporate ¶¶1-118 by reference.

120.    Defendants Digiliti Money, Mack and Meier suppressed and concealed material facts concerning the true nature of Digiliti Money's business (as set forth herein) with the intention that Plaintiffs would thereby be induced to purchase Digiliti Money securities.

121.    Defendants Digiliti Money, Mack and Meier owed Plaintiffs a duty to disclose material facts due to their peculiar knowledge of the concealed facts, their unique position of control over the facts necessary for Plaintiffs to make their decisions, and (at a minimum) the partial misstatements that defendants Digiliti Money, Mack and Meier voluntarily made, among other things.

122.   By virtue of their reasonable and actual reliance on the obligation of defendants Digiliti Money, Mack and Meier to provide accurate facts, and without knowledge of the material facts that defendants Digiliti Money, Mack and Meier concealed, Plaintiffs were induced to enter into the transactions at issue.  Defendants Digiliti Money, Mack and Meier intended to induce Plaintiffs to act on the basis of incomplete, concealed facts.

123.   Plaintiffs suffered damages as a direct and proximate result of their reliance on the facts that defendants Digiliti Money, Mack and Meier fraudulently concealed, in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.   Awarding compensatory damages in favor of Plaintiffs against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.   Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C.   Awarding rescission or a rescissory measure of damages; and

D.   Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED:  March 7, 2018                    **HELLMUTH & JOHNSON PLLC**


/s/Anne T. Regan
Anne T. Regan
8050 West 78th Street
Minneapolis, MN  55439
Telephone:  952/941-4005
952/941-2337 (fax)
aregan@hjlawfirm.com


**ROBBINS GELLER RUDMAN
    & DOWD LLP**
DAVID C. WALTON
LUCAS F. OLTS
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
davew@rgrdlaw.com
lolts@rgrdlaw.com

***ATTORNEYS FOR PLAINTIFFS***